

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

RECEIVED
MAY 1 0 2006
By_____

LYNN KOHAN
Vs.
H&R BLOCK, INC.

C.A. No.    2006 CA 003552 B

**INITIAL ORDER**

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order, and any General Order issued **by the judge** to whom the case is assigned. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(o).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to: Judge ANNA BLACKBURNE-RIGSBY
Date:  May 8, 2006
Initial Conference: 9:30 am, Friday, August 11, 2006
Location:  Courtroom 519
             500 Indiana Avenue N.W.
             WASHINGTON, DC 20001

Caio.doc

CA Form 1

# Superior Court of the District of Columbia
## CIVIL DIVISION
### 500 Indiana Avenue, N.W., Room JM-170
### Washington, D.C. 20001 Telephone: 879-1133

| Lynn Kohan | |
|---|---|
| *Plaintiff* | ე003552-06 |

VS.

| H&R Block, Inc. H&R Block Financial Advisors, Inc. | Civil Action No. |
|---|---|
| *Defendant* | |

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon your exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below.** If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue. N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

| Tracy D. Rezvani | |
|---|---|
| Name of Plaintiff's Attorney | By _____ |
| Finkelstein Thompson & Loughran | Deputy Clerk |
| Address | |
| 1050 30th Street NW, Washington DC 20001 | |
| 202-337-8000 | Date 05/08/06 |
| Telephone | |

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(6)-456/Mar. 98    **NOTE:** SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

|  |  |  |
|---|---|---|
| LYNN KOHAN,<br>2201 Wisconsin Ave. NW # 404<br>Washington, DC 20007 | ) | J 0JJ52-06 |
|  | )<br>) |  |
| Plaintiff, | ) | Civil Action No._____ |
| v. | )<br>) |  |
|  | ) |  |
| H&R BLOCK, INC.,<br>World Headquarters<br>4400 Main St.<br>Kansas City, MO. 64111 | )<br>)<br>)<br>)<br>) | COMPLAINT |
|  | ) |  |
| H&R BLOCK FINANCIAL<br>ADVISORS, INC.<br>719 Griswold St., Suite 1700<br>Detroit, MI. 48226 | )<br>)<br>)<br>) |  |
|  | )<br>) |  |
| Defendants. | )<br>) |  |

RECEIVED
Civil Clerk's Office
MAY 0 8 2006
Superior Court of the
District of Columbia
Washington, D.C.

Plaintiff, Lynn Kohan, by her undersigned attorneys, brings this action on behalf of the General Public of the District of Columbia against H&R Block Inc. and H&R Block Financial Advisors, Inc. (collectively, "H&R Block" or "Defendants"), and alleges the following:

**NATURE OF THE CASE**

1.      H&R Block, Inc. ("H&R Block") is the nation's largest tax preparation company, with approximately 10,000 offices in the District of Columbia and other states. In a typical year, H&R Block helps file more than 15 million tax returns, mostly for middle- and low-income clients, representing more than 15% of the tax returns filed in

1

the United States. In addition to tax services, H&R Block offers financial products to its clients such as loans, mortgages, and warranties.

2.    Since 2001, H&R Block has marketed an individual retirement account ("IRA") called the "Express IRA," representing it as a suitable retirement vehicle and as a "better way to save" with "great rates." Unlike many other IRAs which offer various investment options such as stocks, bonds, and mutual funds, the Express IRA has only one investment option: an FDIC insured money market account. Such accounts typically pay an interest rate less than the rate of inflation. In addition to paying a nominal interest rate, the Express IRA charges high fees that are not adequately disclosed. As a result of the low interest rate and high fees, the Express IRA is a retirement account that will actually shrink over time.

3.    In marketing the Express IRA, H&R Block has violated the District of Columbia Consumer Procedures Protection Act by, *inter alia*, failing to disclose the full extent of the fees associated with the Express IRA; failing to adequately warn its customers that these fees will reduce their principal over time unless they make large or repeated deposits; failing to adequately disclose penalties meant to discourage early withdrawals; and failing to provide its clients with adequate guidance in determining whether the Express IRA is a suitable retirement investment.

## PARTIES

4.    Plaintiff, Lynn Kohan, is currently a resident of the District of Columbia residing at 2201 Wisconsin Ave., NW. She brings this action on behalf of the general public.

5.     Defendant H&R Block is incorporated under the laws of the State of Missouri. H&R Block conducts extensive business in the District of Columbia and has at least 18 offices operating in the District of Columbia.

6.     Defendant H&R Block Financial Advisors is a subsidiary of H&R Block and is incorporated under the laws of the State of Michigan. H&R Block Financial Advisors conducts extensive business in the District of Columbia. H&R Block offers the Express IRA through H&R Block Financial Advisors in conjunction with a New York company called Reserve Funds, Inc. ("Reserve Funds").

## JURISDICTION

7.     Jurisdiction of this Court is founded on D.C. Code § 11-921. This Complaint arises under the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.* and the Court, therefore, has subject matter jurisdiction thereunder.

8.     Venue is proper in this District. The claims asserted in this complaint arise, in part, within this District. Plaintiff resides in this District and seeks to represent residents of this district who have purchased an Express IRA from Defendants based on their misleading marketing and inadequate disclosures. Defendants transact business in this District and have caused injury within the District.

## THE INTERESTS OF THE GENERAL PUBLIC

9.     H&R Block marketed its Express IRA program to customers without disclosing the high fees that are involved, and without disclosing that, for most customers, such a product is a money-losing proposition.

3

10.    Because Plaintiff has reason to believe that Defendants have engaged in, and will continue to engage in the unlawful practices set forth herein, she has reason to believe that Defendants have caused, and will continue to cause damage and adverse effects to residents of this District.  For these reasons, Plaintiff acts for the benefit of the General Public.

## FACTUAL BACKGROUND

**The Express IRA**

11.    H&R Block earns most of its revenues by preparing individual tax returns for a fee.  In recent years, however, H&R Block has made a concerted effort to expand its business to offer financial products to its customers in order to increase its revenues and retain tax clients.  In doing so, H&R Block holds itself out to its clientele as a trusted financial adviser, describing itself as a "trusted tax partner" and "personal financial partner".

12.    In January 2001, H&R Block began marketing the Express IRA. H&R Block sees products such as the Express IRA as a way of retaining customer refunds and ensuring that customers return each year to H&R Block.  As the Chief Executive Officer of H&R Block explained: "The more important attribute of the [E]xpress IRA that we think we can leverage overtime [sic] is the retention impact it has on tax clients . . . .  [C]lients who leave some of their money behind with us at H&R BLOCK, are far more likely to come back to H&R BLOCK year after year...." (Transcript of Q2 2002 H&R Block Earnings Conference Call dated Nov. 28, 2001 at 10).

4

13.    Because H&R Block tax professionals are not licensed to sell securities such as stocks, bonds, or mutual funds, the Express IRA has only one investment option: an FDIC insured money market account.

14.    Money market accounts, however, are a poor vehicle for retirement savings as they typically pay an interest rate less than the rate of inflation.  As the Wall Street Journal recently explained:

> Money-market funds are a smart way to set aside money for next month's tuition or for emergencies.  But with an interest rate that hovers around the inflation rate, they are an awful vehicle for retirement savings.  'Especially with savings rates as low as they are, a 100% allocation to a money-market account is not safe,' says Richard Thaler, a University of Chicago economist ... he calls it a 'guarantee of inadequate retirement income.'

(Wall Street Journal, August 4, 2005 at A2).

15.    In 2002, the average Express IRA rate was 0.50% while the inflation rate was 2.4%.  In 2003, the average Express IRA rate was 1.00% while the inflation rate was 1.9%.  In 2004, the average Express IRA rate was 0.80% while the inflation rate was 3.3%.  (Email dated April 9, 2004, attachment, Express IRA Historical Fee Schedule.xls).  In 2005, the average Express IRA rate was about 1.5% while the inflation rate was 3.4%.

16.    In addition to paying interest rates below inflation rates, H&R Block charges the following fees for the Express IRA:  (1) a $15 set-up fee, (2) a $15 re-contribution fee, (3) a $25 account termination fee (which at one point was $75), (4) a $10 annual maintenance fee, and (5) duplicative "tax complexity" fees, averaging $20 per client to file requisite-IRA-related tax forms.

**H&R Block's Marketing of the Express IRA**

17.    Until 2006, H&R Block marketed the Express IRA as being a "better way to save" and as having "great rates." Indeed, the phrases "better way to save" and "great rates" were featured prominently on the front of the Express IRA brochure, the only general explanatory material given to the customers before they open an Express IRA. (Express IRA brochure at 1). Additionally, this brochure explicitly claims that the Express IRA is a "better way to save," a way to "save for your future while you earn great rates on the money your deposit," and a way to"[s]tart making more money on your savings right now." (Express IRA brochure at 1-2).

18.    The idea that the Express IRA was an investment with a significant rate of return is emphasized by a chart in the brochure showing a hypothetical investment growing from $0 to $52,516 over a 15 year period. (Express IRA brochure at 4). This chart assumes monthly contributions of $250 per month for fifteen years and an annual interest rate of 2.0 percent. H&R Block knew, however, that the customers to which it marketed the Express IRA were extremely unlikely to contribute $250 every month for 15 years or $3,000 per year, since most of them made less than $30,000 per year.

19.    In 2006, in response to an investigation by New York Attorney General Eliot Spitzer, H&R Block stopped using the "great rates" message in its marketing materials. Nevertheless, H&R Block's new brochure continues to promote the "competitive interest rates" of the Express IRA.

20.    Once customers purchased an Express IRA, they received a "Welcome" brochure in the mail. In the "Welcome" brochure, H&R Block claims: "[w]hen you save money in your Express IRA, you earn interest on your contributions, and then you earn

interest on the interest!  The effect of compounding interest is how you build up your savings." (Welcome to Express IRA brochure).

**H&R Block's Knowledge of Problems With the Express IRA**

21.    In the last four years H&R Block has opened more than 500,000 Express IRA accounts.  The Express IRA, however, is not a suitable retirement investment for most of the people who have invested in it.  The typical customer who opens an Express IRA earns under $30,000 per year and is saving for the first time.  (Express IRA Post Mortem – Tax Season 2004 at 3).  The median initial deposit to an Express IRA account is approximately $300; the median account balance is $323.51.

22.    For the last several years, the median Express IRA account has earned about $3.00 in interest per year, nowhere near enough to cover the fees charged by H&R Block for the Express IRA.

23.    H&R Block has always been aware of problems with the Express IRA's low interest rates and high fees.

24.    For example, in 2002, H&R Block's Chief Executive Officer, Mark Ernst, was informed of the fundamental deficiency of the Express IRA through an e-mail by an H&R Block district manager:

> I've been thinking about all the clients that we signed up for IRA's [sic] this past tax season.  Our mission was to help these clients begin a savings plan since many of them had none.  Many used $300 from their refunds to fund the plan.  My concern is the $10 maintenance fee that they will be assessed.  ...  Many of these clients do not have savings or checking accounts.  Even those clients with checking don't always want others having access to them due to problems with possible bounced checks.  So they will earn about $1.50 in interest and be charged $10 maintenance fee.  This may result in a lot of clients electing to withdraw their

money from the IRA.  Then they will be assessed $75 (25%
of their initial investment).

I really don't think the maintenance fees should exceed the
amount of interest that we are paying on these accounts.
Clients won't be happy seeing thier [sic] investments
decreasing and not increasing.

(Email to Mark Ernst, May 29, 2002).

25.     The CEO forwarded the e-mail to the H&R Block product manager adding

his own concerns:

The attached note (from a DM) reflects the general sense
that I think exi[s]ts - that Express IRA is the right thing for
our clients, but the product is designed to nickel and dime
clients to the point where our field people don';t [sic] feel
as good about the product as they should.  You should
seriously look at whether, with a bank product design, we
can eliminate the fees so that our people feel better about
the offer.

(Email from Mark Ernst, May 29, 2002).

26.     A July 2002 H&R Block study reported that "[s]ome Tax Pros unaidedly

[sic] expressed dissatisfaction with the 2002 [Express IRA] product claiming the interest

rates were a sizeable conversion hurdle." (XIRA Product Enhancements presentation at

8).

27.     An August 2002 draft report by the Express IRA product manager noted

that research on the Express IRA had found "Interest rate too low" and "Fees too high".

(Express IRA Draft Presentation, dated Aug. 22, 2002 at 4).  The report suggested

eliminating the set up and maintenance fees but this proposal was not implemented.

(Express IRA presentation, SVP Channel Development, at 7).

28.     In November 2002, the manager of the Express IRA product

acknowledged that the Express IRA does not pay "great rates," writing in an e-mail: "We

realize that a money market interest rate does not offer above average yields." (Email RE: Suggestion from Anonymous, dated Nov. 7, 2002).

29.    A November 2003 report by the product manager of the Express IRA similarly acknowledged the problems with the Express IRA:

> Top 4 reasons tax pros are not offering the [Express IRA]:
> 1. $15 setup fee - "it's too steep for my clients"
> 2. $15 recontribution fee - "they've already paid once, why charge the again?"
> 3. Low interest rate - "my client will never make up the fee"
> 4. $10 annual maint.  fee - "my clients have to pay this in addition to the $15 fee"

The report concluded: "From the Tax Pro's perspective, clients are charged more in fees than they will earn in interest ... [a]s a result many don't offer the product to their clients, and in particular, won't offer it to their low-income clients." (Express IRA Pricing Enhancements, spreadsheet dated Nov., 2003 at 5).

30.    Rather than addressing the fundamental problems highlighted by its tax professionals, H&R Block management attempted to appease tax professionals by subsidizing the rate for a period of 18 months starting in early 2003.  (Email re: XIRA Interest Rate Change dated May 6, 2004).  The subsidy had the effect of adding 0.80% to the prevailing Express IRA rate of 0.10% (one tenth of one percent).  But even with the subsidy, tax professionals expressed dissatisfaction with an interest rate that was less than 1%.  (Express IRA Pricing Enhancements, spreadsheet dated Nov., 2003 at 6).  The rate subsidy ultimately ended in the spring of 2004.

31.    In August 2004, when reviewing the Express IRA promotional material, an employee at H&R Block headquarters observed — "I'd like to modify the message on this brochure as well e.g. the 'great rates' message doesn't seem to sit well with tax pros."

(Email Fw: Express IRA-English dated Aug. 27, 2004)(emphasis in original).

Ultimately, H&R Block decided to keep the "great rates" message.

32.    By October 2004, the Express IRA rate ranked dead last in H&R Block's own internal comparison with other money market rates. (Email re: Express IRA Interest Rate Updated, dated Oct. 8, 2004, attachment IRupdate 100804.xls).

33.    In internal discussions during February 2005, H&R Block was candid that it did not even aspire to offer "great rates": the Express IRA product manager stated that H&R Block would be "comfortable to be in the bottom half nationally in terms of interest rate." (Email Fw: Follow-Up on XIRA Rates, dated Feb. 24, 2005).

**H&R Block Failed to Adequately Disclose Fees Associated With the Express IRA**

34.    Given H&R Block's knowledge of the problems stemming from the low interest rates and high fees, H&R Block's marketing of the Express IRA was deceptive and misleading. H&R Block failed to adequately disclose the fees associated with the Express IRA.

35.    While the fees associated with the Express IRA are substantial relative to its low rate of return, H&R Block fails to instruct its tax professionals to discuss the product's fees with the customer.

36.    The written policies and procedures instructing tax professionals on how to offer the Express IRA do not mention fees and only instruct the tax professional to"[p]rovide the client with Disclosure and Custodial Agreement and gain acceptance." (Policies and procedures – seven steps, undated). This Disclosure and Custodial Agreement is a 19-page document filled with small print, most of which is legal jargon incomprehensible to the customer. Moreover, the agreement only lists the Express IRA's

$25 closing fee, and does not mention other potential fees. (2004 Express IRA Disclosure Statement and Agreement for Individual Retirement Accounts at 12).

37.   The Express IRA's remaining fees are listed on a card describing the Express IRA product that is given to H&R Block's tax professionals. H&R Block has no policies or procedures requiring its tax professionals to show this product card to customers or to discuss the listed fees.

38.   After a customer has decided to purchase an Express IRA and the tax professional inputs the necessary information into a computer program, the only fee listed on the tax professional's computer screen is the $15 opening fee. H&R Block has no policies or procedures instructing the tax professional to direct the customer's attention to this fee.

39.   At the end of the tax preparation session, when the customer has already decided to purchase the Express IRA and is ready to sign the tax return, H&R Block provides various documents to the customer. Starting in 2004, these documents included a fee summary listing the $15 opening fee, but not the other fees associated with the Express IRA. In addition, some customers also received a receipt listing the $15 opening fee after the tax return is signed.

40.   H&R Block does not give customers a written document describing all of the Express IRA's fees in a comprehensible format before the customer decides to open an Express IRA account. The customer is provided with a basic Express IRA fee schedule in a "Welcome" document mailed to the customer weeks after he or she opens

11

an account.[1]  The fee schedule was only disclosed in a confusing footnote at the bottom

of the page that specifies:

> An Account may be charged a $15 Account opening or $15 Recontribution Fee if
> none of the following apply.
>       -Account owner qualifies and takes advantage of the saver's credit
>       -Account has minimum balance of $2000
>       -Minimum monthly systemic investment of $150 is established
>       -Account owner purchases a Refund Anticipation Loan

(Express IRA Fee Schedule).  Most accounts in fact had to pay these fees.

      41.    Moreover, H&R Block fails to inform clients that opening an Express IRA

increases the complexity of a client's tax forms and results in the client paying additional

fees to H&R Block.  H&R Block internally refers to these fees as "tax complexity" fees,

or, as one H&R Block employee describes, the "increase in tax preparation fees that are

related to an Express IRA."  An internal study reports that H&R Block expects to earn an

average of more than $20 in tax complexity fees per Express IRA account (Email re:

xIRA, dated Dec. 17, 2003, attachment at 3), resulting in an additional $3.3 million of fee

revenue per year.  With tax complexity fees, first-year Express IRA fees approach $50, or

16% of the median $300 initial investment.

      42.    While tax complexity fees are part of the cost of an Express IRA, H&R

Block does not adequately disclose them to its clients.  The tax complexity fees are not

itemized on the tax professional's computer screen.  H&R Block's policies and

procedures do not generally require the tax professionals to provide the customer with a

bill itemizing these fees.  H&R Block does not instruct its tax professionals to discuss

---

[1] Until 2005, that fee schedule fraudulently claimed that the Account Opening and
Recontribution fees were $0.00.

these fees with customers or inform them that these fees are part of the Express IRA's cost.

**H&R Block Failed to Adequately Disclose that Express IRAs May Decrease Over Time**

43.    H&R Block failed to adequately inform its customers that the value of their account will decline over time unless they make large and continuing contributions to the Express IRA because of the high fees in comparison to the low interest rates. There is no disclosure relating to the Express IRA's negative rate of return in its marketing materials.

44.    Instead, H&R Block, through its marketing materials as well as the information provided by the Tax Preparers, misleads customers into believing their investment will increase over time.

45.    For example, in 2005, H&R Block's tax preparation screens included a tool to be used by the tax professional in discussions with customers called the "XIRA Calculator." The XIRA Calculator projects the growth of a $300 Express IRA investment assuming a 2% interest rate. Under the heading "Estimated balances for One-time Contribution," the XIRA Calculator predicted for a 23-year-old customer: (1) after one year the investment would grow to $306; (2) after 10 years the investment would grow to $366; and (3) by the time the taxpayer reached the age of 65, the investment would grow to $681. The XIRA Calculator is extremely misleading because it does not include any of the fees associated with the product. In fact, taking into account just the $10 annual maintenance fee: (1) after one year the investment would shrink to $296; (2) after 10 years the investment would shrink to about $256; (3) by the time the taxpayer reached the age of 65, the account would only be worth about $40.

46.     Additionally, as discussed above, through most of the period of its existence, the Express IRA brochure has touted the product as offering "a better way to save" and "great rates."

47.     It is only after the client decides to invest in an Express IRA and is in the process of filling out an account application that he or she is given any disclosure relating to the potential negative rate of return.  Buried at the very end of this lengthy disclosure in small type face on the second page of the Express IRA application is the following sentence: "A one-time, small deposit may cause your principal to be reduced due to this custodial fee." (Express IRA Application at 2).  This disclosure is not only misleading – in fact virtually all small (i.e., $300), one-time Express IRA deposits will eventually lose money – but is completely inadequate because of its size and because it is not provided to the customer before he or she decides to open an Express IRA account.

48.     In any case, this disclosure is ineffective as a high percentage of customers indeed make small, one-time contributions to an Express IRA investment and then see the principal of the investment decline.  According to H&R Block's own calculations, only 27% of Express IRA clients recontribute one year after opening an account, only 13% recontribute two years after opening an account, and only 8% recontribute three years after opening an account.  (Express IRA Post Mortem – Tax Season 2004 at 3).  H&R Block was aware of the low re-contribution rate as early as 2003, when the Express IRA product manager noted: "[t]he re-contribution rate right now is at 21.9% - way below what we expected" (Email re: Continuation of Systematic XIRA, dated March 27, 2003).  Yet H&R Block did nothing to improve its disclosure concerning one-time, small contributions.

14

**H&R Block Failed to Adequately Disclose IRA Penalties Meant to Discourage Early Withdrawals and Warn Customers That The Express IRA Was Not Meant For Short-Term Savings**

49.     Like all IRAs, the Express IRA has features meant to discourage early withdrawals.  With a few limited exceptions, an early withdrawal from a traditional IRA results in the loss of IRA tax benefits and the payment of an additional 10% withdrawal penalty.  In addition, H&R Block currently charges a $25 fee for closing an Express IRA account (reduced from $75).

50.     H&R Block knows that many of its customers are pressed for cash to buy necessities and that they cannot withdraw money from a Traditional IRA for daily needs without paying taxes and penalties.  In its advertising, H&R Block has downplayed the fact that the Express IRA is supposed to be a retirement vehicle with structural features meant to deter early withdrawals.  It has done so because it knows that a long-term savings product is not attractive for many of its customers who have short term savings needs.  As the Express IRA product manager observed in a 2003 e-mail discussing whether to use the word "retirement" in an Express IRA commercial: "I agree that the [sic] using the term 'retirement' is too long-term of a descriptor.  Retirement as commonly defined by most people is not a likely reality for most of our [Express IRA] clients.  Their savings needs are more short-term in nature." (Email Re: Video Commercials Status and Treatment, dated Aug. 13, 2003).

51.     Until very recently, H&R Block's marketing materials implemented this strategy by not featuring the word "retirement" prominently and by characterizing the Express IRA more generally as a "better way to save."  H&R Block did not warn its customers that IRAs are only appropriate for long-term savings until after an

investigation began into its activities. In addition, the materials minimize the significance of tax and penalties for early withdrawals by relegating the warning that "[e]arly withdrawals may be subject to tax and penalty," to a footnote in extremely small type. (Express IRA brochure at 3).

52.    The result of this inadequate disclosure has been that hundreds of thousands of customers have invested in an Express IRA even though they cannot afford to keep the money in an IRA for retirement. Analysis of H&R Block's data shows that the average Express IRA account is closed within just three years. A May 2005 H&R Block study (that treats accounts with less than $10 as open) shows that more than 35% of the Express IRA accounts opened in 2001 and 2002 have since been closed.

53.    H&R Block has been well aware of the high rate of early withdrawals. In late 2003, the product manager of the Express IRA was informed that 43,000 Express IRA accounts (out of approximately 250,000 accounts open at the end of 2003) had balances under $1. (Email Re: XIRA write offs, dated Dec. 12, 2003). A June 2004 chart showed that more than 66,000 Express IRA accounts (out of the approximately 250,000 accounts open at the end of 2003) had balances under $10. (Email Re: Here are my count totals, dated March 30, 2004). Instead of addressing the fact that thousands of H&R Block customers were incurring withdrawal penalties, the product manager of the Express IRA simply closed the accounts. Approximately 30% of the Express IRA accounts opened in 2003 have since been closed. Approximately 20% of the Express IRA accounts opened in 2004 have since been closed.

54.    By de-emphasizing the tax penalties for early withdrawals and marketing the Express IRA as a general savings vehicle, H&R Block has induced hundreds of

thousands of individuals to invest in a product inappropriate for their short-term savings
needs. As a result, Express IRA customers have incurred an estimated $6 million in tax
penalties for these early withdrawals.

**H&R Block's Tax Preparers Are Not Qualified to Determine Whether The Express
IRA is a Suitable Investment for Clients**

55.    While H&R Block claims in its 2005 Express IRA "Welcome" brochure:
"[w]e're here to provide you the most complete tax and financial advice" (Welcome to
Express IRA brochure), it knows it has failed to adequately train its tax professionals to
give advice about the Express IRA. As the manager of the Express IRA wrote in a March
2004 e-mail, "[t]here is a very clear gap between our tax pro's needed level of
understanding of [Express IRAs] and the … training materials." (Email re: Tax Pros,
dated March 15, 2004). As another manager noted in March 2004, "I hear over and over
again 'I don't know enough about IRAs to talk with my clients about them.'" (Email Re:
XIRA Obstacles, dated March 5, 2004).

56.    IRAs are relatively complex products with both tax and financial
implications. For example, holding assets in an IRA can affect an individual's ability to
qualify for food stamps in, some states. (Email Re: Welfare/Social [sic] Serices Issue,
dated 12/8/2004; Email Re IRAs and Assistance Programs, dated Nov. 30, 2004). But
H&R Block tax professionals only receive a few hours of training on the Express IRA,
which focuses only on the tax aspects of IRAs and does not prepare tax professionals to
give financial advice. Unlike financial advisors, tax professionals are not tested on their
knowledge of the Express IRA before being permitted to offer it to customers.

57.    H&R Block knows that it provides low quality financial guidance to its
Express IRA customers. As one employee candidly admitted in April 2002: "We would

17

never, ever, never in a million years, promote a service level for our 'express' clients that had them meeting with advisors one on one. The only 'human' our express clients would ever interact with would be the tax pro or someone at a call center. Now, if an express client wanted to be upsold, that's a different story...." (Email Re: Did you know, dated April 30, 2002). This employee jokingly compared the quality of service an Express IRA customer would receive to a Yugo while more affluent clients who sought securities brokerage services from H&R Block would receive service comparable to that of a Ferrari. (Email Re: Did you know, dated April 30, 2002).

58.     Guidance on the financial aspects of the Express IRA is essential because the product is an inappropriate financial choice for many of H&R Block's clients. As H&R Block has been warned by its own tax professionals, many of H&R Block's clients cannot afford to invest in an Express IRA because they are under a great deal of financial pressure. (Email Re: Things to ponder, dated Aug. 12, 2004). Many clients need cash for daily needs or to pay off high-interest rate credit card debt and are not well served by a long-term savings vehicle. Yet because they have not been adequately trained, H&R Block tax professionals continue to sell Express IRAs to clients who cannot afford to keep funds locked up for substantial amounts of time.

## COUNT I
### (Violation of the District of Columbia Consumer Protection Procedures Act)

59.     Plaintiff incorporates by reference all the paragraphs in this complaint as if fully restated herein.

60.     This Count is brought pursuant to the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.* This Count is alleged

18

against all Defendants on behalf of the General Public of the District of Columbia
pursuant to District of Columbia Code §28-3905(k)(1).

61.    In marketing the Express IRA, H&R Block has violated the District of
Columbia Consumer Procedures Protection Act by, *inter alia*, failing to disclose the full
extent of the fees associated with the Express IRA; failing to adequately warn its
customers that these fees will reduce their principal over time unless they make large or
repeated deposits; failing to adequately disclose penalties meant to discourage early
withdrawals; and failing to provide its clients with adequate guidance in determining
whether the Express IRA is a suitable retirement investment.

62.    By reason of the foregoing, Defendants have violated District of Columbia
Code § 28-3904.

63.    Plaintiff and the General Public of the District of Columbia hereby seek
treble damages or statutory damages in the amount of $1,500 per violation, whichever is
greater, pursuant to D.C. Code § 28-3905(k)(1).  Plaintiffs and the General Public of the
District of Columbia further seek reasonable attorneys' fees and costs plus interest.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendant that:

a)  declaring that Defendants' conduct is in violation of the D.C. Consumer
    Protection Procedures Act;

b)  enjoining Defendants' conduct found to be in violation of the D.C. Consumer
    Protection Procedures Act;

c)  granting Plaintiff and the General Public of the District of Columbia treble
    damages or statutory damages in the amount of $1,500, whichever is greater;

d) granting Plaintiff her costs of prosecuting this action, including attorneys' fees, experts' fees and costs together with interest; and

e) granting such other relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  May 8, 2006                    **FINKELSTEIN, THOMPSON & LOUGHRAN**

_____
Tracy D. Rezvani  (#464293)
Donald J. Enright (#463007)
Hilary Ratway     (#481465)
Stan M. Doerrer
The Duvall Foundry
1050 30th Street, NW
Washington, DC  20007
(202) 337-8000
(202) 337-8090 fax